Riley et al. v. Norman, Admr., etc.

---

RILEY ET AL. v. NORMAN, ADMR., ETC.

1. PLEADING AND PRACTICE: *Misjoinder of actions, how corrected.*
   Under our Code, misjoinder of causes of action can not be cured by demurrer; it must be by motion to strike out the causes improperly joined with others. If that be not done, the objection will be considered as waived.

2. STATUTE OF LIMITATIONS: *At law: In equity.*
   At law, the statute of limitations, to be available, must be pleaded; but in equity it has always been considered as affecting the equity of a bill, upon the principle that the court will not interfere to enforce rights upon which claimants have too long slept.

3. ADMINISTRATION : *Wives and infants failing to except to administrator's settlements.*

Persons under disabilities are not bound by their failure to except to administrator's settlements, and will be heard, after their disabilities are removed, to make out a case of fraud to their prejudice.

APPEAL from *Ashley* Circuit Court in Chancery.

Hon. T. F. SORRELLS, Circuit Judge.

*R. C. Newton* and *John Carroll*, for appellants :

The homestead was sold without the consent of the heirs, and *sec. 3161 Gantt's Digest*, restores it to them.

Argue elaborately upon the facts, and insist that the administrator (Johnson) has charged unauthorized commissions, and has failed to account for assets coming to his hands, etc.

EAKIN, J. Thomas P. Tucker died late in 1859, or early in 1860. On the twenty-third of January, 1860, letters of administration were granted to James H. Johnson. ·

His first account-current, confirmed at the July term, 1861, showed that he had disposed of all the effects which came into his hands, leaving the estate, after charge of commissions, indebted to him in the sum of $82.85. In this settlement he charged himself with the whole value of the property appraised in the inventory, being $5,366.66; and, amongst other things, credited himself with the appraised value of some slaves, $2,150, together with $520.55 in other property or money, all of which had been turned over to the widow as her portion of the estate, or paid for some reason not shown.

Then came the war, with all its well-known consequences upon private and public business. His next account

was filed after its close, on the thirteenth of October, 1865. In this he charged himself with an additional amount received of $200; and claimed credits for further outlays, making the estate indebted to him about $170.

Again, on the eleventh of January, 1868, he filed another account-current, showing no receipts, but additional credits, bringing the estate in his debt $507.73. All these settlements were duly approved and confirmed.

On the twenty-eighth of January, 1873, he filed a final settlement, in which he charges himself with $530, proceeds of the sale of the homestead; and, crediting himself with a series of taxes paid, leaves the estate still indebted to him in a sum something over $100.

Before confirmation, the Probate Courts were abolished, and all their powers transferred to the Circuit Courts; and on the thirteenth of May, 1873, the original bill in this case was filed, on the chancery side, against the administrator, by one of the creditors and the two minor children of the intestate. It is entitled "Exceptions and Bill," and seems intended to serve the double purpose of contesting the confirmation of the last settlement, and of attacking the whole proceedings for fraud, reopening all the accounts, and setting aside a rule which had been made, under supposed probate orders, for the payment of debts. An answer was filed on the first of July, 1873.

It appears that the widow, some time after the death of intestate, had removed to Louisiana, and intermarried with appellant, Riley. By an order, headed "Probate Court, September 11, 1873," made on motion of the plaintiffs, this case, numbered eighty on the docket, was consolidated with Nos. 6 and 57; Mrs. Riley and her husband were made parties to the suit, and had leave to file an amended bill, in which they joined with the others as complainants.

This bill, with its amendments, shows the allowance of

the creditor's claims, which was in the fifth class; alleges the available assets to have been $5,566.66, and the aggregate of the probated debts only $2,097.31; and charges generally that the administration had been fraudulently conducted, to the detriment of the creditor, widow and heirs, or distributees.

Some of these charges are specific, and they only, are worthy of attention. To charge fraud generally, without showing that wherein it consists, or the devices and pretenses by which it was effected, is the mere language of denunciation; and adds nothing to the force of pleading. Amongst the specific charges, the following are the principal:

1. As affecting the widow, it is alleged that the defendant managed and controlled the homestead, and had not accounted to her for the rents which were or should have been received. That a sum of money paid Thacker and Walker, for which he took credit in his first account, was in fact paid by herself, or out of her private means. That, after filing the inventory, in 1866, the administrator demanded and obtained from her a sum of gold, which was her separate property, claiming that it belonged to the estate. That he, at another time, received for her $416, for which he had not accounted, and which was due to her individually, etc. Mrs. Riley does not claim to have any other interest in the estate, or that she has not already received her distributive share. With regard to the homestead, it may be said that her rights ceased with her second marriage, and removal; and she makes no other claim to the real estate. As to the rents, before that time, as well as the other matters, in which she claims to be aggrieved, they were simply personal demands against the individual, James H. Johnson, for which there was a direct remedy at law. As to these matters, the heirs and creditors had no

interest, as their joinder with her amounted to a concession of her rights, and the enforcement of them would in no way inure to their benefit.

2. As affecting the creditor, heirs and distributees, the nature of the charges is, that the administrator had, in divers ways, received assets for which he had failed to account; had failed. to make proper collections; taken improper credits, and procured the sale of the homestead to be made without authority of law, to reimburse himself for the balance thus fraudulently made to appear in his favor.

1. PLEADING AND PRACTICE: Misjoinder of actions, how corrected.

It is evident that the causes of action were such as could not properly be joined; and the court acted unadvisedly in granting leave to the widow to file, with others, the amended bill. The case illustrates the propriety, under the Code practice, of first ascertaining the nature of proposed amendments, and of the claims of proposed new parties, before allowing them to be made. The defendant attempted to make his objections by demurrer, because the bill was multifarious, and that improper parties had been joined. This was properly overruled. The remedy for misjoinder of causes of action is sometimes by demurrer in most of the Code States, but, in Kentucky and here, as well, I believe, as in Iowa, under special provisions of the Code, the remedy is by motion to strike out causes of action improperly joined with others. If that be not done, the objection will be considered as waived; and, although there is no doubt of the power of a court, of its own motion, to decline to proceed with the litigation, in an action of matters totally disconnected and affecting different parties, having no community of interest, still, if it should proceed to adjust and determine all the rights, none of the defendants can complain. (See *Gantt's Digest, section 4550 to 4553*, and remarks and citations of Mr. Pomeroy, in his

work on _Remedial Rights_, sec. _449_, et seq.) Nor can the complainants object to having all matters, determined in the suit, stand as res judicata.

We find nothing in the transcript to advise us of the nature of suits numbered six and fifty-seven, which were consolidated with this. They were probably proceedings on the probate docket.

The defendant Johnson died, pending the suit, and it was revived against the present appellee, his administrator. The case lingered in the court until the eleventh day of August 1880, when a final decree was rendered on all points for the defendant. All the complainants appeal.

Considering, first, the branch of the case affecting Mrs. Riley: The principal matters of which she complains, that is, concerning the gold, and rents of homestead, occurred whilst she was discovert. There can be no cumulative disabilities as to them, and they appear as against Johnson to have been long barred by the statute of limitations. Although in a suit at law the statute must be pleaded, to be made available as a defense, it has always in chancery been considered as affecting the equity of a bill, upon the principle that the court will not readily interfere to enforce rights upon which claimants have long slept. We do not think, moreover, that the allegations as to these matters, or any others, were so clearly proved as to justify the Chancellor after so long a time in finding in her favor, and we are not disposed to disturb his decree denying her relief. So far as her interests are concerned, it is apparent she has already received her full share, if not more.

*2. STATUTE OF LIMITATIONS: At law: In equity.*

With regard to the claims of the creditors and children, to have the administration opened, and the settlements reformed, that must depend, as to the first three, upon fraud.

These have been confirmed, the first in 1861, and the last in 1868, about five years before the filing of this bill. During all this time they have gone unchallenged.

The proof is clear that the administrator received from Mrs. Tucker over five hundred dollars in gold. The heirs and creditors in their bill preclude themselves from claiming any share in this, as they assert positively, and attempt to prove, that it was her individual money. It seems to have been relied on by them to show a general fraudulent disposition. The administrator, however, admits the receipt, and claims to have used it properly in the administration as funds of the estate.

The proof does not show clearly that it was her separate property. The original inventory was lost. The account of 1861 charges the administrator, amongst other assets, with cash $700. Whether there was any other cash besides that received from Mrs. Tucker, sufficient to make up that amount, is not apparent. The bill alleges that he received it after the inventory was filed, and Johnson in his answer omits to respond as to the time, but this is not necessarily conclusive against him on that point. It was not an allegation material to the equity of complainants, but argumentative, to show that the inventory could not be used to cover that sum. When it is remembered that this bill was filed twelve years after the event, and that all the existing scenes of the war had intervened, and that during all the time Johnson's conduct in the matter had gone unquestioned, it is not strange that, as he says, his memory should be confused. It would seem harsh to affix upon him the stigma of fraud, from such a circumstance. In the absence of any proof of any other considerable amount of cash having come into his hands, to account for the charge of $700, which he seems to have administered and accounted for, we may not unfairly presume after a great

lapse of time, that he had either received it before his inventory was filed, or knew of it, and had set it down as assets.

It is plain, too, that he erroneously turned over to Mrs. Tucker, in slaves and other property, more than her share of the personalty of the estate. But it seems equally clear that no fraud was intended. He could not possibly have had any motive for any. The truth seems to be that the estate was at that time solvent, and although the property was somewhat more than her share of the inventoried assets, there were large assets outstanding in the hands of Tucker's surviving partner which, if attached, would more than restore the equilibrium. The courts will not lend their aid to widows, at the expense of creditors and distributees, beyond the provisions of the law, and if exceptions had been filed to the first account in due time, the administrator should not have been allowed credit for the excessive payment. But it seems to have been simply an error in which all parties acquiesced, and does not come within the class of frauds which, after confirmation of the account, courts of chancery will correct.

We have carefully examined the other charges with regard to the first three settlements, and the accounts themselves. It would serve no useful purpose, but incumber the Reports, to discuss them one by one. We think the accounts somewhat unintelligible as to some details, and such as would have required correction, if objections had been early made, but we fail to find any proof of intentional fraud or unfair dealings. The accounts are such as might have been well understood at the time by the Probate Judge and others having a tolerable acquaintance with the people and the affairs of the estate.

The courts have, from a sense of justice, been inclined to treat very leniently all mere irregularities and errors, in

Riley et al. v. Norman, Admr., etc.

the management of estates during the war, making great allowances for the disturbance of the times, the necessities for expedients, the loss of papers and witnesses, the confusion of memories, the destruction of property, insolvency of debtors, and many other matters which belong to the history of that troubled period—that is to say, where there are no marked manifestations of bad faith. We concur with the Chancellor in refusing to reopen the accounts which had been confirmed.

3. Wives and infants failing to except to administrator's settlements.

To guard against misapprehension, we add that this view of the case is not based upon any such idea as that the minor children are bound by the statute of limitations, or may be themselves chargeable with laches. It springs from a natural equity which is obvious. In our system of administration, which we must suppose to be the best our Legislature has been able to devise, there are, in most cases, interests of children and *femmes covert* to be dealt with without notice to them of the proceedings. This is necessary, or the expenses and delays would be unendurable, and fatal to the interests of all. It is expected of husbands and guardians, as well as of creditors and distributees, that they should keep watch over the administrator, take note of his management, and except to his proceedings if erroneous.

May still be heard in chancery for fraud.

It is true that those under disabilities are not bound by their failure, and will be heard after their disabilities are removed, to make out a case of fraud to their prejudice; yet administration proceedings are much in the nature of proceedings *in rem*. As they admit of no delay for infancy or coverture, the courts recognize the hardship and injustice of reopening settlements after a long lapse of years, when the memory of events may have faded, and proofs have been lost, and will not interfere, in the absence of fraud, to correct errors of law, which might have been corrected by

timely exceptions and appeal. This may, and often-does, work a hardship to minors, but it is the imperfection of a human system, and any other view would work a graver hardship in other directions. Women will choose husbands for themselves, and there seems no certain way of securing them against their negligence; but these considerations should impress the Probate Judges with the necessity of seeing to it that trustworthy and careful curators of the fortunes of minors be selected. Meanwhile, the system must be taken with its imperfections, and administered as fairly to all as possible.

With regard to the last settlement, that has never been confirmed, and as the administration has gone back to the Probate Court, it stands there, subject yet to the exceptions made in the Circuit Court.

Whether or not the sale of the homestead was valid, does not affect the minors' right of occupation during minority. The sale was subject to that, in law, even though not expressed. We decline to pronounce upon its validity, inasmuch as the purchaser is not made a party to this suit.

Affirm the decree, without prejudice to the right of complainants, or either of them, to prosecute exceptions, in the Probate Court, to the last settlement; or to contest, by proper proceedings, the validity of the sale of the homestead.